In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2046

BATHUSI MUSA,

*Petitioner*,

*v.*

LORETTA E. LYNCH, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A087-244-589

ARGUED DECEMBER 15, 2015 — DECIDED FEBRUARY 19, 2016

Before BAUER, POSNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Bathusi Musa, a citizen of Botswana, petitions for review of the denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture, all based on her fear that her family will force her to undergo female genital mutilation (FGM) if she returns. We grant the portion of the petition requesting withholding of removal. Substantial evidence does not support the agency's conclusion that Musa

likely will not be subjected to FGM. On the asylum applica-
tion, however, we lack jurisdiction to review the agency's
determination that Musa's asylum application was untimely.
We must dismiss that portion. We also deny the portion of
her petition seeking relief under the Convention Against
Torture because the agency did not err by finding that the
government in Botswana would not acquiesce to forced
FGM.

Musa entered the United States in April 2008 on a visi-
tor's visa. She met a United States citizen and they married.
Musa's husband filed an I-130 "alien relative" petition on
her behalf, and Musa applied at the same time to adjust her
status to permanent resident. See 8 U.S.C. §§ 1151(b)(2)(A)(i),
1255(a); 8 C.F.R. § 245.2; *In re Hashmi*, 24 I. & N. Dec. 785,
789–90 (BIA 2009). In June 2009, however, the Department of
Homeland Security denied the I-130 petition and Musa's ap-
plication to adjust status. The problem was that Musa's hus-
band was discovered not to have ended a previous marriage.
In November 2009 Musa was placed in removal proceedings
because her visa had expired while those applications were
pending. In April 2010, Musa and her husband divorced.

In October 2010, Musa applied for asylum, withholding
of removal, and protection under the Convention Against
Torture because she feared that if she returned to Botswana
her family would force her to undergo FGM.[1] Musa, who
belongs to the Kalanga tribe, said that her mother and

---

[1] FGM is defined by the World Health Organization as a collection of
"procedures that involve partial or total removal of the external female
genitalia, or other injury to the female genital organs for non-medical
reasons." See *Female Genital Mutilation*, World Health Organization,
http://www.who.int/mediacentre/factsheets/fs241/en/.

grandmother hold strict traditional beliefs and think that if a woman does not undergo FGM her entire family will be cursed. Musa's grandmother is, in Musa's words, a "medicine woman" and has performed FGM on other women in the past.

When she lived in Botswana, Musa said, her family on two occasions tried unsuccessfully to force her to undergo the mutilation. On the first attempt, when she was 16, Musa was kidnapped by a group of women and brought to a place where other girls were undergoing FGM. She managed to escape through a bathroom window before the procedure could be carried out, and then—suspecting that her family had instigated the events—hid at a friend's house. Musa's mother eventually acknowledged the family's involvement and promised not to force her to undergo the procedure, at which point Musa returned home.

The second attempt came a year later. Musa said she was attacked by several men who dragged her into some bushes and attempted to "circumcise" her. They told Musa that her mother had sent them. Musa was able to break away, but she sustained bruises all over her body. Musa did not report the incident to the police, she said, because everyone accepted that FGM was practiced and she believed the police would not take her accusation seriously. She also testified that she had two friends who had died from undergoing FGM in Botswana in 2004. Musa continued to live with her parents until later in 2004 or 2005 and then moved to another city in Botswana. Her parents were able to contact her over the phone, but Musa did not disclose her address.

More recently, since leaving Botswana, Musa said that her parents had found her a significantly older marriage

partner (he is 75, Musa is now 30), who could help the family financially. To marry the older man, Musa says, she would have to undergo FGM. Her father, who used to resist having the procedure performed on her, wants her to go through with the marriage because he needs money from the suitor to help his struggling business. Musa is afraid to return to Botswana because she does not want to undergo FGM or marry this man.

Further testimony about FGM in Botswana was presented by one of Musa's friends from Botswana, Gaomongwe Selawe said that FGM was practiced in Botswana as an initiation ritual for girls. She said that she had heard that FGM was practiced by some members of the Kalanga tribe. And she had friends who had undergone the procedure in Botswana. Selawe said that many women do not talk about being forced to undergo FGM because it is a private ritual.

The record before the immigration judge contained documentary evidence showing that FGM is not prevalent in Botswana. The 2011 State Department Country Report in Human Rights Practices for Botswana stated: "There were no known cases of physically harmful traditional practices, such as female genital mutilation." According to UNICEF, FGM is "not widely practiced" in Botswana, though its report in 2005 nevertheless counted 3 million girls in Africa at risk of FGM each year. Finally, Musa attached a letter written by her mother imploring her to return to Botswana to marry the older man the family had found for her.

The immigration judge denied Musa's application for asylum, withholding of removal, and Convention Against Torture relief. Musa was not eligible for asylum, the judge found, because she had not filed a timely application within

one year of her arrival in the United States. The judge also found that neither her marriage to nor divorce from her husband was a changed circumstance justifying her delay. And even if the denial of her application for adjustment of status in June 2009 was a changed circumstance, the judge found, Musa waited an unreasonably long time from that date—more than a year—to file for asylum.

The judge denied Musa's request for withholding of removal because he determined there was not a clear probability that if she returned to Botswana she would be subjected to FGM. The judge believed Musa's testimony that her family practices FGM and on two occasions had attempted to subject her to it forcibly. The judge concluded, however, that those incidents did not amount to past persecution because Musa had not actually undergone the procedure. The judge also believed Musa's testimony that she feared returning to Botswana, but he did not regard her fear as reasonable because there was no evidence in the record showing that FGM was practiced at all, let alone practiced widely in Botswana. The judge noted Musa's admission that her desire to avoid a marriage to a much older man was the principal reason she did not want to return to Botswana, not her fear of FGM.

Finally, the immigration judge denied Musa's request for protection under the Convention Against Torture because she had not presented any evidence showing that the government in Botswana would torture her or acquiesce to torture by anyone else.

The Board of Immigration Appeals affirmed the immigration judge's decision. The Board agreed with the judge's conclusion that Musa's asylum application was untimely because her marriage and divorce were neither changed nor

extraordinary circumstances and she did not file the application in a reasonable amount of time after the denial of her petition for adjustment of status. The Board then explained that it agreed with the judge's denial of Musa's withholding and Convention Against Torture claims because she "has not been able to provide objective evidence of country conditions in Botswana that corroborates her stated fear of FGM." The Board agreed with the judge that Musa's testimony was credible, but it supplemented the judge's reasoning by proposing that Musa could relocate to a different part of the country: "in view of the paucity of FGM occurring in Botswana, and especially in view of the fact that the respondent need not return specifically to her hometown, we cannot conclude that the Immigration Judge *clearly* erred in concluding that the respondent did not show that … persecution or torture—such as FGM—is *likely* to occur."

Musa leads off her petition for judicial review with a weak challenge to the agency's determination that she did not show changed circumstances materially affecting her eligibility for asylum. See 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 1208.4(a)(4), (5). She recognizes that we lack jurisdiction to review such a determination absent a related legal or constitutional argument, see 8 U.S.C. §§ 1158(a)(3), 1252(a)(2)(D); *Almutairi v. Holder*, 722 F.3d 996, 1002 (7th Cir. 2013); *Restrepo v. Holder*, 610 F.3d 962, 964–65 (7th Cir. 2010), so she tries to frame her disagreement with the agency as a legal issue. She disagrees with the Board's conclusions that her marriage and divorce did not constitute changed or extraordinary circumstances, and that it was unreasonable for her to have waited more than a year to apply for asylum after the denial of her application for adjustment of status.

Those disagreements do not raise a justiciable legal question challenging the basis of the agency's determination. She disputes only the application of the law to her circumstance, not the governing legal rules. We thus lack jurisdiction to review the denial of her asylum application. See *Restrepo*, 610 F.3d at 964–65; *Viracacha v. Mukasey*, 518 F.3d 511, 515–16 (7th Cir. 2008).

Musa next argues that substantial evidence does not support the denial of her application for withholding of removal because the judge wrongly disregarded her testimony about her family's FGM practice—testimony that he explicitly credited. We agree. The fact that FGM is not widespread in Botswana as a whole does not contradict her statements about her family's practice.

We have held consistently that FGM is a form of persecution. See *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004); *Olowo v. Ashcroft*, 368 F.3d 692, 702–03 (7th Cir. 2004); see also *In re Kasinga*, 21 I. & N. Dec. 357, 358 (BIA 1996). Still, Musa bears a high burden to establish eligibility for withholding of removal: she must show a clear probability of persecution if removed to Botswana. See *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010); *Guardia v. Mukasey*, 526 F.3d 968, 971 (7th Cir. 2008); 8 C.F.R. § 1208.16(b)(2). A clear probability means it appears more likely than not that she will suffer persecution if removed. *Bitsin v. Holder*, 719 F.3d 619, 628 (7th Cir. 2013); see *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005); 8 C.F.R. § 1208.16(b)(2).

The immigration judge here erred by placing too much weight on the absence of background evidence confirming prior cases of FGM in Botswana at large. The absence of documented cases of FGM in that country does not contra-

dict Musa's testimony—testimony that the judge explicitly credited—that her family practiced FGM. The judge found that Musa testified credibly that her family practiced FGM, that they had twice attempted to force her to undergo it, and that her family—including her father, who once opposed subjecting her to the practice—now wants her to enter into a marriage conditioned upon her undergoing it.

Whether FGM is widely practiced in Botswana or not has no bearing on whether Musa's own family is likely to subject her to it. The judge credited Musa's testimony about her family's FGM practice. He erred by failing to acknowledge the likelihood that she will be subjected to FGM upon returning to Botswana and acceding to the marriage. Musa's credible testimony is sufficient to sustain her burden of proof. Neither the judge nor the Board denied Musa's claim based on a lack of corroboration under the Real ID Act, 8 U.S.C. § 1158(b)(1)(B)(ii). (Under that act, an immigration judge may require an applicant who testifies credibly to provide reliable corroborating evidence as well. See *Tian v. Holder*, 745 F.3d 822, 828 (7th Cir. 2014).)

The judge also erred by characterizing Musa's principal motivation for seeking withholding of removal as her fear of marrying a much older man rather than fear of FGM. Once the judge accepts an applicant's testimony about fear of persecution as genuine, the existence of other fears does not undermine her claim. See *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005) ("an individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act").

The Board's conclusion that Musa could safely relocate to another part of the country is also problematic. The immigration judge did not address whether Musa could relocate to a different part of Botswana to avoid her family's pressure to undergo FGM, or whether she could reasonably be expected to do so. See 8 C.F.R. § 1208.16(b)(2). The possibility of relocation, for that matter, was not even argued by the government before the Board.

As an initial matter, it is not clear that the Board has the authority to make a finding in the first instance that Musa could relocate. See 8 C.F.R. § 1003.1(d)(3)(i) ("The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge … shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous."). Even if the Board were permitted to determine the relocation issue in the first instance, its cursory declaration about the feasibility of relocation gave no rationale. The Board did not address whether Musa's ability to relocate safely might be compromised in light of her testimony that she now faces greater danger because of her family's marital arrangements and her father's apparent change of heart regarding his prior opposition to her undergoing FGM. "'[I]t seems possible … that the agency might be compelled to reach the opposite conclusion depending how it evaluates the record after remand.'" *Kone v. Holder*, 620 F.3d 760, 764 (7th Cir. 2010), quoting *Gomes v. Gonzalez*, 473 F.3d 746, 752 (7th Cir. 2007).

We add that the agency has waived any argument about denying withholding based on Musa's failure to provide evidence of government involvement or acquiescence in the

practice of FGM in Botswana. Neither the immigration judge nor the Board relied on that ground as a basis to deny withholding. See *SEC v. Chenery*, 318 U.S. 80, 87–88 (1943); *Sarhan v. Holder*, 658 F.3d 649, 661 (7th Cir. 2011); *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007).

Although we vacate and remand the decision regarding withholding of removal, we agree with the Board that Musa is not entitled to relief under the Convention Against Torture. The implementing regulations define torture as "severe pain or suffering … inflicted by or at the instigation of or with the consent or acquiescence of a public official." 8 C.F.R. § 208.18. Female genital mutilation is torture, of course. But the judge did not err by finding that Musa failed to show that torture is likely to be carried out by or with the acquiescence of the government in Botswana. See *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014); *Ishitiaq v. Holder*, 578 F.3d 712, 718 n.3 (7th Cir. 2009); 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1). The judge justifiably discounted Selawe's testimony and was unswayed by Musa's, and Musa has not pointed to evidence in the record to substantiate her testimony that the government would have permitted her family to subject her to FGM even if she had reported their attempts in 2002 and 2003.

Accordingly, the portion of the petition relating to Musa's request for asylum is DISMISSED, the portion of the petition relating to withholding of removal is GRANTED, and the portion of the petition relating to protection under the Convention Against Torture is DENIED. The case is remanded to the Board of Immigration Appeals.